UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
EVE SILBERBERG, JENNIFER REBECCA
WHITE, and MICHAEL EMPEROR,

                         Plaintiffs,                          16-cv-8336 (PKC)

       -against-                                 MEMORANDUM
                                                     AND ORDER

BOARD OF ELECTIONS OF THE STATE OF
NEW YORK, CO-CHAIRS PETER S.
KOSINSKI and DOUGLAS A. KELLENER,
COMMISSIONERS ANDREW J. SPANO and
GREGORY P. PETERSON; BOARD OF
ELECTIONS OF THE CITY OF NEW YORK
PRESIDENT MARIA R. GUASTELLA,
SECRETARY FREDERIC M. UMANE, and
COMMISSIONERS JOSE MIGUEL ARAUJO,
JOHN FLATEAU, PH.D., LISA GREY,
MICHAEL MICHEL, MICHAEL A. RENDINO,
ALAN SCHULKIN, SIMON SHAMOUN,
ROSANNA VARGAS; NEW YORK COUNTY
DISTRICT ATTORNEY'S OFFICE, DISTRICT
ATTORNEY CYRUS VANCE; KINGS
COUNTY DISTRICT ATTORNEY'S OFFICE,
DISTRICT ATTORNEY ERIC GONZALEZ,

                         Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

           This is an action to enjoin the enforcement of a provision of New York Election

Law.  According to the parties, the provision bars the taking of "ballot selfies," the act of

photographing one's image together with one's marked ballot for the purpose of posting the

photograph on a social media site.  Celebrities, politicians and government leaders, even Pope

Francis and the Dali Lama, have had selfies taken, posted, and viewed thousands or millions of

times.  They are a potent form of speech presumptively entitled to First Amendment protections.

Plaintiffs' important First Amendment rights must be reconciled with the cherished right to vote.  Courts have held that an individual's right to speech related to a political campaign must give way, for example, to a state-imposed restriction that prohibits campaigning within 100 feet of an entrance to a polling place.  Burson v. Freeman, 504 U.S. 191 (1992).

At issue is N.Y. Elec. Law § 17-130(10), which provides that "[a]ny person who . . . [s]hows his ballot after it is prepared for voting, to any person so as to reveal the contents . . . is guilty of a misdemeanor."  The provision, enacted 126 years ago, was part of 19th century legislation popularly known as the Australian ballot reforms.  The statute did not merely offer the voter the option of voting in secrecy, but mandated it, and for good reason.[1]  As Justice Blackmun noted in Burson, the nation had been plagued with voter bribery prompted by ballots that political parties "often printed with flamboyant colors, distinctive designs, and emblems so that they could be recognized at a distance."  504 U.S. at 200.  The problem was not resolved by standardized ballots because "the vote buyer could simply place a ballot in the hands of the bribed voter and watch until he placed it in the polling box."  Id.

Because of the statute, those who would engage in ballot policing, for the purpose of bribery or to enforce orthodoxy among members of a group, whether members of union, employees of a company, or members of a religious group, have longed been deprived of an essential tool for success.[2]  The absence of recent evidence of this kind of voter bribery or

---

[1] H. J. Bass, The Politics of Ballot Reform in New York State, 1888-1890, 42 J. New York History 253, 261 (1961) ("N.Y. Ballot Reform").

[2] N.Y. Ballot Reform at 261.  According to a press report, Tammany Hall bribe-givers came up with a creative attempt to circumvent the newly-enacted prohibition.  Under the plan, "the briber would say to the man with the vote to sell, 'we cannot tell whether you keep your promise and earn your money or not.  To show us that you carry out your contract you must take the Tammany ballot and erase the name of the candidate for Controller and write your own name in its place.  Vote for yourself for Controller, and then our election inspectors can tell that you have voted the Tammany ticket, and after the election you will get your money'."  Desperate Tammany: A Plan to "Beat" the New Law Nipped in the Bud, New York Times, Nov. 3, 1890, p. 5.

intimidation does not mean that the motivation to engage in such conduct no longer exists. Rather, it is consistent with the continued effectiveness of the New York statute.

This action was commenced 13 days before the presidential election, even though the statute has been on the books longer than anyone has been alive. Selfies and smartphone cameras have been prevalent since 2007. A last-minute, judicially-imposed change in the protocol at 5,300 polling places would be a recipe for delays and a disorderly election, as well-intentioned voters either took the perfectly posed selfie or struggled with their rarely-used smartphone camera. This would not be in the public interest, a hurdle that all preliminary injunctions must cross.

For reasons that will be further explained, the motion for a preliminary injunction is denied.

DISCUSSION

I.    Standing.

While neither party cites to recent prosecutions under the statute at issue, none of the defendants have disclaimed an intent to enforce it on election day. Therefore, the threat of prosecution, as it appears at the preliminary injunction stage, is "concrete and particularized" rather than "conjectural or hypothetical." Lujan v. Defs. of Wildlife, 504 U.S. 560 (1992) (quotation marks omitted).

At the outset, the Court notes that the plaintiffs only have standing to challenge section 17-130(10) as it applies to in-person voting and not to absentee ballots. Plaintiffs' affidavits assert only that they each "intend to vote in the General Election to be held on November 8, 2016." (Emperor Aff. 1; Silberberg Aff. 1; White Aff. 1.) There is no suggestion in any of the plaintiffs' submissions that they intend to vote via absentee or military ballot. In

fact, the Complaint alleges that "[p]laintiffs are registered voters in New York who wish to take ballot selfies *when they vote on* November 8, 2016." (Compl. ¶ 21) (emphasis added). Considering that ballots completed outside of a polling place, like absentee or military ballots, are generally marked and filed prior to election day, the Complaint strongly implies that plaintiffs intend to vote in person on November 8.

When confronted with this issue at oral argument, plaintiffs' counsel offered that his clients had standing to challenge section 17-130(10) as it applied to absentee ballots because they could change their minds and decide not to vote in person, or could have some kind of emergency and need to vote by absentee ballot. Plaintiffs' counsel points out that they could obtain ballots from the Board of Elections up until the day before the election. (Hearing Tr. 39); https://www.elections.ny.gov/VotingAbsentee.html. But, the mere possibility that injury may occur is not enough to confer standing, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." Lujan, 504 U.S. at 564 n.2; id. (while an injury may be deemed speculative when it depends on actions of third parties beyond the plaintiff's control, Supreme Court case law "also mention[s] the plaintiff's failure to show that he will soon expose *himself* to the injury."); see also Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013) ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (citations and quotation marks omitted). Photographs of absentee, overseas, or military ballots present unique issues that have not been briefed by the parties. The Court concludes that the plaintiffs do not have standing to assert claims based on the application of section 17-130(10) to ballots completed outside of a polling site and accordingly does not address that situation.

II.     <u>Preliminary Injunction Standard.</u>

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Grand River Enter. Six Nations, Ltd. v. Pryor.</u>, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). Ordinarily, a plaintiff seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." <u>Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.</u>, 696 F.3d 206, 215 (2d Cir. 2012).  But "[w]hen, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." <u>Red Earth LLC v. United States</u>, 657 F.3d 138, 143 (2d Cir. 2011) (quotation marks omitted).  "Additionally, the moving party must show that a preliminary injunction is in the public interest," <u>Oneida Nation of N.Y. v. Cuomo</u>, 645 F.3d 154, 164 (2d Cir. 2011) (citing <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 19-20 (2008)), and that "the balance of equities tips in his favor," <u>Winter</u>, 555 U.S. at 20.

The state defendants contend that because the injunction "will provide the [plaintiffs] with substantially all the relief sought and that relief cannot be undone even if the defendant[s] prevail[] at a trial on the merits," a heightened preliminary injunction standard should apply.  <u>N.Y. ex rel. Schneiderman v. Actavis PLC</u>, 787 F.3d 638, 650 (2d Cir. 2015) (quoting <u>Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.</u>, 60 F.3d 27, 33-34 (2d Cir. 1995)). Under this heightened standard, the Second Circuit requires the movant to show a "clear or substantial likelihood of success on the merits and make a strong showing of irreparable harm in

addition to showing that the preliminary injunction is in the public interest." <u>Schneiderman</u>, 787 F.3d at 650 (citations and quotation marks omitted).

Under either standard, the plaintiffs have failed to make the necessary showing for a preliminary injunction.

A.    <u>Irreparable Harm.</u>

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976). Specifically, "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." <u>Bronx Household of Faith v. Bd. of Educ. of City of N.Y.</u>, 331 F.3d 342, 349 (2d Cir. 2003).  Here, plaintiffs allege that they will suffer irreparable injury in the absence of a preliminary injunction because section 17-130(10) directly prevents them from exercising their First Amendment rights by taking and posting photographs of completed ballots.  Therefore, irreparable harm is presumed.  <u>See Bronx Household of Faith</u>, 331 F.3d at 349-50.

B.    <u>Likelihood of Success on the Merits.</u>

The First Amendment prohibits the government from making any law "abridging the freedom of speech," U.S. Const. amend. I, and "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." <u>Eu v. San Francisco Cty. Democratic Cent. Comm.</u>, 489 U.S. 214, 223 (1989) (quoting <u>Monitor Patriot Co. v. Roy</u>, 401 U.S. 265, 272 (1971)).  The plaintiffs allege that section 17-130(10) violates this constitutional guarantee by restricting New York voters' rights to communicate by sharing photographs of marked ballots through the internet and social media.

- 6 -

1.      <u>Public Forum.</u>

Content-based restrictions on speech in traditional public fora are generally
subject to strict scrutiny and are "presumptively unconstitutional . . . justified only if the
government proves that they are narrowly tailored to serve compelling state interests." <u>Reed v.
Town of Gilbert</u>, 135 S. Ct. 2218, 2226 (2015); <u>Perry Educ. Ass'n v. Perry Local Educators'
Ass'n</u>, 460 U.S. 37, 45 (1983).  However, when the state regulates speech in a nonpublic forum,
neither strict nor intermediate scrutiny apply.  <u>See</u> <u>Longo v. U.S. Postal Serv.</u>, 983 F.2d 9, 12 (2d
Cir. 1992); <u>Marlin v. D.C. Bd. of Elections & Ethics</u>, 236 F.3d 716, 719 (D.C. Cir. 2001).
Instead, the regulation need only be reasonable and viewpoint neutral, <u>see</u> <u>Longo</u>, 983 F.2d at 12,
and there is no requirement that the regulation be the most reasonable restriction available, <u>id.</u>

Plaintiffs argue that section 17-130(10) is a content-based restriction that should
be subjected to strict scrutiny.  However, as conceded by plaintiffs' counsel at oral argument,
polling places are generally not considered to be public fora (Hearing Tr. 12), and therefore any
regulation of speech at a polling place is evaluated only under a reasonableness standard.
<u>Marlin</u>, 236 F.3d at 719 ("[T]he interior of a polling place, is neither a traditional public forum
nor a government-designated one. . . . The only expressive activity involved is each voter's
communication of his own elective choice and this has long been carried out privately—by secret
ballot in a restricted space."); <u>PG Publ'g Co. v. Aichele</u>, 705 F.3d 91, 100 n.10 (3d Cir. 2013)
("We take this opportunity to make explicit that which has been implicit in our preceding
discussion: A polling place is a nonpublic forum."); <u>United Food & Commercial Workers Local
1099 v. City of Sidney</u>, 364 F.3d 738, 749-50 (6th Cir. 2004) ("By opening up portions of school
and private property for use as polling places on election day, Ohio has not opened up a
nontraditional forum for public discourse."); <u>Cotz v. Mastroeni</u>, 476 F. Supp. 2d 332, 364-65

(S.D.N.Y. 2007) ("Polling places clearly are non-public fora and voters present are subject to various First Amendment restrictions, including those based on content."). The Supreme Court's determination in <u>Burson</u> that the 100-foot perimeter of a polling place is a public forum does not undermine this finding because, unlike in <u>Burson</u>, the restricted activity here is initiated within the polling place rather than the environs of the polling site. See <u>Burson</u>, 504 U.S. at 196-98; <u>see also id.</u> at 216 (Scalia, J., concurring) (disagreeing with the plurality and arguing that even "the environs of a polling place, on election day, are simply not a traditional public forum") (quotation marks omitted).

Using current technology, posting a ballot selfie may be accomplished inside the voting booth or at a different place and time. The affidavits of the plaintiffs do not assert at what point in time they intend to post their ballot photographs, claiming only that they "want the opportunity to photograph [their] filled out paper ballot[s] to post publically." (White Aff. 2; Silberg Aff. 2; Emperor Aff. 2.) The Court does not need to decide when the act of uploading would occur for a particular voter. It suffices that the statute reasonably addresses conduct that *could* occur inside the polling booth, and in all cases *begins* in the voting booth.[3] On this point the Court departs from the analysis of the district court in <u>Rideout v. Gardner</u> which found that the nonpublic forum doctrine did not apply to New Hampshire's ballot selfie law "because disclosure [of the photograph] will generally take place far away from the polling place." 123 F. Supp. 3d 218, 230 (D.N.H. 2015), <u>aff'd</u>, __ F.3d __, 2016 WL 5403593 (1st Cir. Sept. 28, 2016). No evidence has been presented regarding when or where photographs, necessarily taken at a polling location, will be electronically uploaded to social media. Therefore, the Court

---

[3] The present expedited posture of this preliminary injunction motion does not require the Court to consider whether the challenged statute would likely pass muster under a strict scrutiny analysis applicable to a public forum.

respectfully declines to accept the premise that "the speech that the law restricts necessarily occurs in forums that the government does not own or control."  Id. at 231.

2.      Viewpoint Neutrality.

The law at issue forbids voters from displaying completed ballots "so as to reveal the contents" of that completed ballot, N.Y. Elec. Law § 17-130(10), but it does not prohibit ballot exposure based on the viewpoint expressed in the ballot.  Therefore, it is viewpoint neutral and need only be "reasonable in light of the purpose which the forum at issue serves" in order to pass constitutional muster.  Perry, 460 U.S. at 46-49.

3.      Reasonableness.

States have a recognized interest in preserving the integrity of the election process.  See Eu, 489 U.S. at 231; Burson, 504 U.S. at 199 ("a State has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election process").  Section 17-130(10) was enacted in order to prevent vote buying, voter intimidation, and to preserve the secrecy of the ballot.

As was detailed in Burson, early American elections were plagued by voter intimidation and election fraud.  504 U.S. at 200-02.  In order to combat rampant vote buying, intimidation, and coercion, New York adopted a series of reforms in the late 1800s designed to protect the integrity of elections, id. at 203-04, including a prohibition against showing a marked ballot to another person so as to reveal the contents of that ballot.  N.Y. L. 1890, Ch. 262 § 35.  These reforms, many of which focused on preserving the secrecy of the ballot, aimed to reduce voter bribery by removing the ability to determine whether the bribery or intimidation had been successful.  See Burson, 504 U.S. at 202-03.  The success of such reforms ultimately led to their adoption across all 50 states.  Id. at 206.

Defendants argue that section 17-130(10) continues to be "effective in avoiding the bribery, coercion and intimidation that once were common and are still a serious risk" today, by preventing voters from proving his or her vote to another.  (State Defs.' Mem. 4.)  Indeed, the ubiquity and ease of smartphone technology plausibly increases the risk of one form of voter intimidation.  Without the statute, employers, unions, and religious groups could encourage their members to upload images of their marked ballots to a single location to prove their commitment to the designated candidate.  Those who declined to post a selfie could be swiftly outed and subjected to retaliation.  This not-so-subtle form of voter intimidation is squarely within the zone of the statute's intended reach.  Vote monitoring by employers was one of the abuses that lead to the Australian ballot movement.[4]

Plaintiffs would have the Court follow the reasoning adopted by the First Circuit in Rideout, __ F.3d __, 2016 WL 5403593, and by the district courts in Indiana Civil Liberties Union Found., Inc. v. Indiana Sec'y of State, 15 cv 01356 (SEB) (DML), 2015 WL 12030168 (S.D. Ind. Oct. 19, 2015), and Rideout, 123 F. Supp. 3d 218.  Those courts found that while vote buying and other forms of coercion may have been prevalent when this law was originally passed, "the historical record establishes that vote buying has not been a significant factor in elections in more than 100 years."  Rideout, 123 F. Supp. 3d at 233.  They therefore concluded that the states' claims that the challenged laws were necessary to further the states' interest in preventing vote buying and protecting the secrecy of the ballot were overly speculative.

However, the Supreme Court has already explained that where, as here, the challenged law has been in effect for a long period of time, it is difficult for a state to provide empirical evidence to show what would happen if the law was invalidated.  See Burson, 504 U.S.

---

[4] N.Y. Ballot Reform at 255.

at 208-09 (upholding a longstanding buffer zone around polling places).  The absence of recent

evidence of the evils that the statute was intended to redress suggests the statute has been

efficacious.

              Rideout and Indiana Civil Liberties Union Foundation, Inc. are distinguishable on

this basis.  Both of these decisions concerned recently enacted laws that specifically targeted

ballot selfies rather than longstanding bans on displaying marked ballots.  See Rideout, 2016 WL

5403593, at *1 (striking down an amendment to a New Hampshire statute that prohibited "taking

a digital image or photograph of [a] . . . marked ballot and distributing or sharing the image via

social media or by any other means"); Indiana Civil Liberties Union Found., Inc., 2015 WL

12030168, at *1 (enjoining enforcement of an Indiana statute which criminalized taking "a

digital image or photograph of the voter's ballot while the voter is in a polling place" and

"distribut[ing] or shar[ing] the image . . . using social media or by any other means").  In

contrast, the ban on showing another person a completed ballot has been in place in New York

for 126 years and does not target any particular technology.

              Courts in other ballot selfie cases have also found that laws that criminalize

exposing completed ballots are unconstitutional because they are overinclusive.  See Rideout,

123 F. Supp. 3d at 234 ("the means the state has chosen to address the issue will, for the most

part, punish only the innocent while leaving actual participants in vote buying and voter coercion

schemes unscathed"); Indiana Civil Liberties Union Found., Inc., 2015 WL 12030168, at *6

("Indiana's new law seems far more likely to ensnare a large number of voters wishing to make a

political point or expressing their pride in voting or recording the moment for some innocuous

personal reason than it is to achieve the State's goal of protecting voters from vote-buying

predators.").  In addition, these courts have found that the laws at issue fail the narrow tailoring

prong of the more stringent strict scrutiny analysis because the states could have criminalized only the actions of voters who take and share pictures of their completed ballots as part of a vote-buying scheme, rather than of anyone who shares a photo of a marked ballot.  See, e.g., Indiana Civil Liberties Union Found., Inc., 2015 WL 12030168, at *6.

As the Supreme Court pointed out in Williams-Yulee v. Florida Bar, "the First Amendment does not confine a State to addressing evils [only] in their most acute form."  135 S.Ct. 1656, 1671 (2015).  Regulations of speech in a nonpublic forum need "not be the most reasonable or the only reasonable limitation" available and, "[i]n contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated."  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 808 (1985).  New York's decision to prohibit voters from displaying their marked ballots was a reasonable means of ensuring the integrity of the election and the secrecy of the ballot.  Section 17-130(10) only prohibits showing another person one's completed ballot, and even then, only for the purpose of revealing the contents of that ballot. Voters are free to express their pride in voting and even reveal who they voted for in any number of other ways.  This is more than enough to satisfy a reasonableness inquiry.

C.     Public Interest and Balance of the Equities.

In addition to showing irreparable harm and a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also show that the balance of equities tips in his favor, and that granting the preliminary injunction would serve the public interest.  Winter, 555 U.S. at 20.  In the case at bar, the public interest would not be served by granting the immediate relief plaintiffs seek.  The statute at issue was enacted in 1890.  Smartphone cameras have been in heavy use since the iPhone launched in 2007, and earlier camera phone technology has existed

- 12 -

since the late 1990s. Yet the plaintiffs did not file this action until October 26, 2016, just thirteen

days before a presidential election.

        As the Sixth Circuit pointed out in <u>Crookston v. Johnson</u>, "[w]hen an election is

'imminent' and when there is 'inadequate time to resolve factual disputes' and legal disputes,

courts will generally decline to grant an injunction to alter a State's established election

procedures." __ F.3d __, 2016 WL 6311623, at *2 (6th Cir. Oct. 28, 2016) (quoting <u>Purcell v.

Gonzalez</u>, 549 U.S. 1, 5-6 (2006) (per curiam)); <u>Reynolds v. Sims</u>, 377 U.S. 533, 585 (1964)

("[i]n awarding or withholding immediate relief, a court is entitled to and should consider the

proximity of a forthcoming election and the mechanics and complexities of state election laws"

and should "endeavor to avoid a disruption of the election process which might result" from the

court's decision); <u>Conservative Party of N.Y. State v. N.Y. State Bd. of Elections</u>, 10 cv 6923

(JSR), 2010 WL 4455867, at *2 (S.D.N.Y. Oct. 15, 2010) (denying preliminary injunction where

plaintiffs waited until six weeks before an election to file their action citing "the obvious

potential for confusion created by a change that would have to be made on such short notice and

without adequate training of personnel"). Regardless of the potential merits of the plaintiffs'

claim, granting a preliminary injunction at this late stage is a recipe for confusion and delays at

the polls.

        Plaintiffs endeavor to justify their delay by pointing to the "national spotlight on

the issue of ballot-selfies," that they only recently became aware that a ballot selfie would be

illegal in New York, and that presidential candidate Donald Trump has "warned supporters about

'election rigging' leading many voters . . . to fear that they may be intimidated at the polls and

therefore should document their ballots through photography." (Robinson Affirmation 2.)

While these considerations may have some relevance to defendants' argument that the doctrine

of laches bars plaintiffs' claims for injunctive relief and undermines their claim of irreparable injury, that is beside the point in assessing whether an injunction is in the public interest. The focus of the inquiry is not merely on the conduct of the parties but whether the injunction would impair or impede some right or interest of non-parties. Here the interest of the general public in the outcome of an election is profound.

Enjoining enforcement of section 17-130(10), just days before the general election, would seriously disrupt the election process. Defendants have already trained more than 60,000 poll workers, who will be deployed to 5,300 poll sites across the state. (Valentine Decl. 4.) Instructions and signage have been created and packaged for distribution to each individual polling site. (Id. at 4; Leible Decl. 2.) According to Todd D. Valentine, Co-Executive Director of the New York State Board of Elections,

> Logistically, a preliminary injunction impacting poll site operations would be extraordinarily difficult to meaningfully implement one week before an election. At this late hour, New York's fifty-eight boards of elections simply cannot redo all of their election day handbooks and re-educate poll workers in any meaningful way. Even if the re-education process was logistically possible . . . such a change in the rules at this point would undoubtedly cause confusion among voters and poll workers and distract election administrators from the critical tasks that ensure the orderly administration of the imminent election.

(Valentine Decl. 4-5.) In assessing a last-minute challenge to an analogous law in Michigan, the Sixth Circuit explained, "[a]bsent the best of reasons, not remotely presented here, elections officers should not have to disseminate a new, difficult-to-implement policy to 30,000 poll workers in the week before a presidential election." Crookston, __ F.3d __, 2016 WL 6311623, at *2. Requiring Defendants to make substantial changes to election policies at the eleventh hour is simply unreasonable, particularly given the fact that the plaintiffs could have brought their challenge several months or years ago.

- 14 -

Not only would a preliminary injunction wreak havoc on election-day logistics, real concerns exist about the delays and privacy intrusions that ballot selfies could cause.  Both the State and the City are expecting large numbers of voters for the general election on November 8, 2016.  (Leible Decl. 2; Valentine Decl. 3.)  It is not unreasonable to expect that permitting voters to take selfies with their completed ballots will add unnecessary delays to the voting process.  In addition, those taking ballot selfies inside a polling place may inadvertently capture the ballots of other voters who did not wish to have their ballots publicized.  (See Valentine Decl. 3-4.)  Enjoining enforcement of section 17-130(10) would also remove a principal guarantee of election integrity that has been in use and successful for 126 years.  In fact, at oral argument, plaintiffs' counsel stated that the requested injunction was not limited to ballot selfies but would also allow voters to show their marked ballots to people inside the polling place for the purpose of proving who they voted for (Hearing Tr. 19), reviving the precise evil that lead to the adoption of section 17-130(10).

Before granting a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (citations and quotation marks omitted).  The public's interest in orderly elections outweighs the plaintiffs' interest in taking and posting ballot selfies.  The defendants have laid out in detail the potential consequences of a preliminary injunction and the ways in which those consequences will negatively impact the experience of voters at the polls.  (State Defs.' Mem. 9; Leible Decl. 3.)  While enforcing the challenged law will deny plaintiffs the opportunity to engage in the political speech of sharing photos of completed ballots, they are not

prevented from expressing the same political message through other powerful means. Accordingly, the balance of equities tips in favor of the defendants.

    III.    <u>New York City Board of Elections No-Photography Policy.</u>

        In response papers and declarations the City defendants cite a New York City Board of Elections policy that has been in place for over 20 years prohibiting photography inside polling sites.  (City Defs.' Mem. 11; Umane Decl. 1-3.)  This policy is apparently publicized through "no photography" signs posted at polling places.  (Leible Decl. 2.)  No claim is made that this ban is reflected in any statute or regulation, and no mechanism for its enforcement has been described by the defendants.  Plaintiffs did not challenge this policy in their complaint because they did not know that it existed (Hearing Tr. 8), but plaintiffs' counsel orally moved to enjoin this policy at the hearing, <u>id.</u>  However, because the record on this photography ban is so poorly developed, the Court declines to rule on the New York City Board of Elections ban on photography.

CONCLUSION

        For the foregoing reasons, plaintiffs' motion for a preliminary injunction (Dkt. 1) is DENIED.


        SO ORDERED.


                                                                       P. Kevin Castel
                                    United States District Judge


Dated:  New York, New York
        November 3, 2016