UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EVE SILBERBERG, JENNIFER REBECCA
WHITE, and MICHAEL EMPEROR,

                         Plaintiffs,                              16-cv-8336 (PKC)

          -against-                                              MEMORANDUM
                                                                 AND ORDER

BOARD OF ELECTIONS OF THE STATE OF
NEW YORK, CO-CHAIRS PETER S.
KOSINSKI and DOUGLAS A. KELLNER,
COMMISSIONERS ANDREW J. SPANO and
GREGORY P. PETERSON; BOARD OF
ELECTIONS OF THE CITY OF NEW YORK
PRESIDENT MARIA R. GUASTELLA,
SECRETARY FREDERIC M. UMANE, and
COMMISSIONERS JOSE MIGUEL ARAUJO,
JOHN FLATEAU, PH.D., LISA GREY,
MICHAEL MICHEL, MICHAEL A. RENDINO,
ALAN SCHULKIN, SIMON SHAMOUN,
ROSANNA VARGAS; NEW YORK COUNTY
DISTRICT ATTORNEY'S OFFICE, DISTRICT
ATTORNEY CYRUS VANCE; KINGS
COUNTY DISTRICT ATTORNEY'S OFFICE,
DISTRICT ATTORNEY ERIC GONZALEZ,

                         Defendants.
------------------------------------------------------------x

CASTEL, Senior District Judge:

            These are the Court's findings of fact and conclusions of law after a bench trial of

an action to permanently enjoin a provision of New York Election Law that prohibits the

showing of a marked ballot to another person as applied to the taking of a photograph depicting

an individual along with that individual's marked ballot (known as a ballot selfie) and posting it

to a social media site.  Also challenged is a separate policy of the Board of Elections of the City

of New York (the "City Board") that prohibits photography at polling sites, subject to exceptions for members of the press who obtain proper credentials.

N.Y. Elec. Law § 17-130(10), first enacted in 1890 as part of the Australian ballot movement, provides that "[a]ny person who . . . [s]hows his ballot after it is prepared for voting, to any person so as to reveal the contents . . . is guilty of a misdemeanor." The language of this statute and the purpose for its enactment—combating vote buying and voter intimidation by depriving the perpetrator of a means by which to verify his target's compliance—sweep within their reach the act of taking a ballot selfie at a polling place and posting it to a social media site. Posting a photograph of one's marked ballot to social media is indisputably a potent form of political speech, presumptively entitled to protection under the First Amendment.

For reasons to be explained, the statute as applied to ballot selfies survives strict scrutiny. The State of New York has a compelling interest in preventing vote buying and voter coercion. The State's interest in the integrity of its elections is paramount. The law is also narrowly tailored, for a law prohibiting the display a marked ballot only for the purpose of vote buying or coercion would be ineffective.

Alternatively, the Court finds that the statute is a reasonable, viewpoint neutral restriction of speech within a non-public forum.

The City Board's policy prohibiting photography is not a content-based restriction and is not in tension with the First Amendment. This policy is narrowly tailored to address significant state interests, such as avoiding longer wait times at the polls. Narrower restrictions are unlikely to be effective.

Judgment will be entered for the defendants.

BACKGROUND and EVIDENCE

I.      Procedural History.

Plaintiffs commenced this action on October 26, 2016, less than 2 weeks before the 2016 presidential election, and moved for a preliminary injunction against enforcement of N.Y. Elec. Law § 17-130(10) against voters who, like plaintiffs, wished to photograph themselves together with their completed ballots at polling sites in New York City and then post those photographs to a social media site.  The Court denied the motion with respect to photographs of marked ballots taken at polling sites, and declined to reach the issue of photographs of ballots not voted at polling sites due to plaintiffs' failure to demonstrate standing. (Nov. 3, 2017, Mem. and Order, Dkt. 20 at 3-4.)  The Court also declined to rule on the City Board's no photography policy because the record was inadequately developed.  (Id. at 16.)

Plaintiffs amended their complaint on December 27, 2016, (Dkt. 46), and again on April 17, 2017, (Second Amended Complaint, Dkt. 90 ("SAC").)  The SAC includes a challenge to the City Board's no photography policy.  (SAC at ¶¶ 23-27.)  The SAC added plaintiff Michael Nabavian, an American citizen living in the United Kingdom who allegedly intends to vote in future federal elections by absentee ballot.  (SAC at ¶ 8.)  The SAC further alleges that plaintiffs Rebecca White and Michael Emperor expect to vote by absentee ballot in the 2017 general election.  (SAC at ¶ 28.)  The SAC alleges that both § 17-130(10) and the City Board's no photography policy violate the First Amendment to the United States Constitution as well as art. I, § 8 of the New York Constitution.

The bench trial was held on August 29 and 31, 2017.  Witness testimony and documentary evidence was received from all parties.  At the close of plaintiffs' case, plaintiffs

consented to the withdrawal of all claims regarding photographs of absentee ballots or other ballots not voted at polling sites.  (Tr. 39-40.) [1]

II.     The Evidence at Trial.

A.     Plaintiffs' Case in Chief.

Plaintiffs called two witnesses: plaintiff Eve Silberberg and Katherine Brezler, the National Digital Director for The People for Bernie Sanders.  Plaintiffs also introduced documentary evidence, specifically a photograph of President Donald Trump and his wife voting and the City Board's Basic Poll Worker Manual for 2017/2018.

Ms. Silberberg, who is registered to vote in New York County, intends to vote in the 2017 and 2018 general elections, and wishes to photograph her marked ballot at the polling site and then show the photograph to others by posting it to social media or in some other manner.  (Direct Testimony of Eve Silberberg, July 7, 2017, Dkt. 110-2 ("Silberberg Direct") at ¶¶ 3-5.) [2]

Ms. Brezler, who has worked on numerous political campaigns in New York, specializes in digital activism and grassroots organizing.  (Direct Testimony of Katherine Brezler, July 7, 2017, Dkt. 110-6 ("Brezler Direct") at ¶¶ 5-7.)  Ms. Brezler testified that, based on her experience, "[s]ocial media has become a critical organizing tool," used by "[m]ost candidates for competitive political campaigns on state and federal levels," and that "[s]ocial media is a more effective medium today than television and print media to reach people with a political message."  (Brezler Direct at ¶ 8.)  Ms. Brezler testified to the importance of grassroots

---

[1] Defendants contend that plaintiff Nabavien, as a permanent resident of a foreign country, would vote by "special federal ballot" rather than by absentee ballot.  (City Defs.' Trial Brief, July 28, 2017, Dkt. 122 at 12 n.4.)  Because plaintiffs have withdrawn all claims regarding photographs of ballots not voted at a polling site, the Court construes any challenge regarding photographs of special federal ballots to be withdrawn.
[2] At the Court's direction, direct testimony of witnesses was presented by each side in written form, subject to live cross-examination and redirect.

social media activism and her belief that messages on social media conveyed with both words and images are more powerful than messages conveyed with words alone.  (Brezler Direct at ¶¶ 9, 13.)  Ms. Brezler testified that many people do in fact take photographs of marked ballots at New York City polling sites and post those photographs to social medial.  (Brezler Direct at ¶ 14.)  She believes that a photograph of an individual's marked ballot posted to social media is a "uniquely compelling" message with "unique credibility."  (Brezler Direct at ¶ 16.)  Ms. Brezzler opined that a ballot selfie was an effective way to convince people to vote for a certain candidate. (Brezler Direct at ¶ 16; Tr. 24.)

Ms. Brezler admitted that her opinions regarding the relative impact of messages with words, and messages with both words and images, were not based on any studies or surveys.  (Tr. 23-25.)  Instead her opinions were based on her personal experience and frequent discussions with colleagues.  (Tr. 24.)

B.  State Defendants' Case in Chief.

The State Defendants are the New York State Board of Elections (the "State Board") and its commissioners, Peter Kosinski, Douglas Kellner, Andrew Spano, and Gregory Peterson, in their official capacities as Commissioners of the State Board.  The State Defendants called two witnesses: defendant Douglas Kellner, Co-Chair of the State Board, and Professor E. Scott Adler.

The State Defendants also introduced documentary evidence, including images of New York ballots before the introduction of uniform ballots and documents related to the ongoing prosecution in this district of the perpetrators of an alleged vote buying scheme.

i.     Co-Chairman Kellner.

Co-Chairman Douglas Kellner testified regarding the history of voting in New York, recent vote buying schemes, and the history of and continued need for N.Y. Elec. Law § 17-130(10).  Co-Chairman Kellner was a commissioner of the City Board from 1993 until 2005, when he was appointed as Co-Chair of the State Board.  (Direct Testimony of Douglas Kellner, July 28, 2017, Dkt. 127-4 ("Kellner Direct") at ¶ 1.)  He has testified as both an expert witness and a fact witness in numerous election law proceedings, including proceedings in federal court.  (Kellner Direct at ¶ 2.)  The State Board and the county boards of election are bipartisan agencies created by New York's legislature and tasked with administering and enforcing New York's election laws.  (Kellner Direct at ¶ 5.)

Voting by ballot was first instituted in New York in 1777 for the election of certain public officials.  (Kellner Direct at ¶¶ 6-7.)  New York's second Constitution, adopted in 1821, required voting by ballot for most public offices.  (Kellner Direct at ¶ 7.)  Early in the era of ballot voting, the government did not print ballots.  (Kellner Direct at ¶ 8.)  Voters either cut ballots out of newspapers or obtained printed ballots distributed near polling sites by candidates' partisan supporters, which listed the names of the partisan's favored candidates.  (Kellner Direct at ¶ 8.)  Due to the design of these ballots, an observer could tell for whom the individual was voting by watching the voter place the ballot in the ballot box.  (Kellner Direct at ¶ 9.)  An 1880 law attempted to remedy this problem by requiring uniform-style ballots on white paper. (Kellner Direct at ¶ 9.)  This measure was unsuccessful as partisans were able to print ballots in different shades of white paper, thereby maintaining their ability to observe which candidates' ballot a voter placed in the ballot box.  (Kellner Direct at ¶ 10.)  In the era of distinguishable ballots, bribing and intimidating voters was commonplace, because a voter's choice could be

verified by observing the physical characteristics of the ballot he deposited in the ballot box. (Kellner Direct at ¶ 10.)

To address these continued problems, New York began mandating secret ballots starting in 1890 as part of the Australian ballot movement.  (Kellner Direct at ¶ 12.)  Mandating secret ballots was just one measure the legislature took to restore integrity to New York's electoral process.  Other measures included assigning county governments the responsibility for printing ballots, mandating that the ballots be uniform, introducing the voting booth, prohibiting electioneering within 150 feet of the polling place, and criminalizing the display of a marked ballot.  (Kellner Direct at ¶ 12.)

N.Y. Election Law § 17-130(10) has been in effect in substantially the same form for 127 years.  (Kellner Direct at ¶ 13.)  Based upon Co-Chairman Kellner's research, the legislative intent behind the law was:

> [T]o protect not only the fundamental right of individual voters to cast a ballot in a manner that is not susceptible to coercion, intimidation or vote buying, but also the right of all voters, as well as candidates, to elections free of such pressures.  The theory behind the law was that prohibitions against bribery and intimidation would have little effect if individual voters could voluntarily offer documentary proof of how they were voting to a briber or intimidator, whereas barring the voter from supplying such proof would discourage the coercive conduct by making the voter's compliance unverifiable. . . .   The prohibition in § 17-130(10) against showing one's marked ballot to another person does not just protect the voter who may be tempted or pressured to share his or her marked ballot; it also protects all other voters and candidates from the distortion of elections by votes prompted by bribery or intimidation.  It thus protects the integrity of the elective system and the right of all voters and candidates to honest elections.

(Kellner Direct at ¶¶ 4, 13-14.)

The 1890 reforms appear to have had their intended effect: while prosecutions for bribery and coercion of voters were commonplace before these reforms were enacted, since then

such prosecutions have declined substantially.  (Kellner Direct at ¶ 15.)  But all attempts to bribe

voters have not ceased.  (Kellner Direct at ¶ 16.)  Within the last five years vote buying schemes

have been uncovered in New York and elsewhere.  (Kellner Direct at ¶ 16.)  In Co-Chairman

Kellner's opinion this shows that "[t]he economic and political motivations for voter bribery still

exist, but the ability to carry out such a scheme is significantly hampered by the prohibition" on

showing a marked ballot.  (Kellner Direct at ¶ 16.)

According to Co-Chairman Kellner, the laws prohibiting vote buying and voter

coercion would be more difficult to enforce without a prohibition on the display of a marked

ballot.  (Tr. 47-48.)  However, even without such a law, a vote buyer still faces obstacles in

verifying his target's compliance.  For example, a voter may obtain a new ballot if his or her

original ballot is "spoiled."  (Tr. 49.)  A voter can receive up to three additional ballots this way.

(Tr. 49.)  So it would be possible for a voter targeted by bribery or intimidation to mark a ballot,

photograph it, then spoil that ballot and then mark and submit a new ballot.  (Tr. 49.)  But voters

who receive additional ballots through this process are noted in the "registration book," which is

available for review by the public.  (Tr. 51-52.)  Thus, a voter trying to double-cross a vote buyer

could be caught.  A voter who sold his vote could erase the marking on a ballot after

photographing it, then mark different selections.  But, according to the testimony of Co-

Chairman Kellner, this would likely invalidate the ballot.  (Tr. 49-50.)

Though New York law mandates that voting be done in secret, it does not require

that voting booths be used; it is permissible to mark one's ballot at the polling place, but outside

of the voting booth, so long as one does not display one's ballot.  (Tr. 45.)  And while voters may

not knowingly display their marked ballot, voters need not take any special steps to prevent

others from seeing their marked ballot.  (Tr. 45-46.)  Because of the distance between voting

booths and the angle of sight lines, a person standing at a voting booth in New York City would not be able to see the ballot of the person in the next booth merely by turning his or her head to the side or leaning slightly.  (Tr. 46.)

ii.      Professor Adler.

E. Scott Adler, Ph. D., Professor of Political Science at the University of Colorado at Boulder testified as an expert regarding the history of the Australian ballot reforms and their importance to the integrity of American elections and opined that legalizing ballot selfies would contribute to an increase in vote buying and voter coercion.

The adoption of the secret ballot in the United States was part of a set of late 19th-centry reforms intended to address corruption in the electoral process, including vote buying. (Direct Testimony of Stephen Adler, August 7, 2017, Dkt. 128-1 ("Adler Direct") at ¶ 9.)  Other reforms adopted in New York and elsewhere to ensure the secrecy of the ballot included the introduction of government-printed ballots containing the names of all candidates and rules prohibiting removing ballots from polling places.  (Adler Direct at ¶ 11.)  Today, every state has laws requiring voting by secret ballot.  (Adler Direct at ¶ 14.)

Dr. Adler testified that the key impediment to vote buying and voter intimidation schemes is the inability for the perpetrators to monitor their targets' voted ballots at polling sites. (Adler Direct at ¶ 6.)  A voter could accept a bribe, agree to vote for a certain candidate, and then vote for another candidate but still collect payment because the vote buyer has no way to confirm that the voter followed through on the agreement other than the voter's word.  (Adler Direct at ¶ 19.)  Allowing photographs to be taken of marked ballots at polling sites and then shown to others would remove this impediment and make it simple for perpetrators to verify the votes of their targets.  (Adler Direct at ¶ 6.)

Following the implementation of these reforms, political corruption committed at polling sites and the ballot box virtually disappeared.  (Adler Direct at ¶ 15.)  However, this was not for lack of trying on the part of individuals determined to continue their fraudulent schemes to monitor their targets' votes; such individuals devised various verification methods such as bribing corrupt election officials, recording a voter's selection on carbon-copy paper, marking ballots with identifiable patterns, accompanying voters into the voting booth under the pretense that the voter was illiterate, and switching ballots filled out in the presence of the vote buyer with ballots provided at the polling site.  (Adler Direct at ¶ 23.)

Voter coercion and intimidation can also corrupt elections.  Documented examples of such intimidation involve threats of eviction, loss of employment, and physical violence.  (Adler Direct at ¶ 35.)  More subtle forms of coercion exist in the form of social pressure to vote in a particular way by employers, family, and friends.  (Adler Direct at ¶ 36.)  Concerns regarding undue pressure by employers are heightened by the fact that nearly half of employers already attempt to recruit employees into political action and communicate with workers regarding voting, including directing workers to support particular candidates.  (Adler Direct at ¶ 40.)  Employees are more likely to accede to this pressure when they are being monitored.  (Adler Direct at ¶ 41.)  Such monitoring could take the form of either explicit direction or social pressure to reveal a photograph of one's marked ballot on social media. (Adler Direct at ¶ 42.)

Studies on electoral corruption in various countries show that vote buying increases when a voter's vote may be monitored.  (Adler Direct at ¶ 21.)

Allowing ballot selfies would likely negatively impact voter participation by increasing wait times at polling sites.  (Adler Direct at ¶ 57.)  Ten to fifteen percent of non-voters fail to vote due to lengthy wait times.  (Adler Direct at ¶ 59.)

C.  City Defendants' Case in Chief.

The City Defendants are the City Board, its commissioners (Maria Guastella, Frederic Umane, Jose Miguel Araujo, John Flateau, John Zaccone,[3] Michael Michel, Robert Siano, Alan Schulkin, Simon Shamoun, and Rosanna Vargas), New York County District Attorney Cyrus Vance, Acting Kings County District Attorney Eric Gonzalez, and their respective offices.  The City Defendants called two witnesses: Michael Ryan, the Executive Director of the City Board, and Professor Stephen Graves.

The City Defendants also introduced copies of the no photography signs placed in polling sites and slides used for instructing poll workers where the signs are to be displayed at the polling site.

i.    Director Ryan.

Director Michael Ryan recounted the history of the City Board's policy restricting photography at polling sites and explained the continued need for such policy.  Director Ryan has been the Executive Director of the City Board since August 2013, and before that served as the Commissioner of Elections in the City of New York.  (Direct Testimony of Michael Ryan, July 28, 2017, Dkt. 122-2 ("Ryan Direct") at ¶ 1.)

City Board policies are made by majority vote of the ten commissioners at City Board meetings.  (Tr. 98.)  Since at latest 1995 the City Board has had a policy prohibiting photography at polling sites by anyone other members of the press who have obtained prior

---

[3] Commissioner Zaccone was appointed to fill Commissioner Grey's seat upon her resignation and was automatically substituted as a defendant.  Rule 25(d), Fed. R. Civ. P.

authorization from the City Board and met certain requirements.  (Ryan Direct at ¶ 3.)  The policy was adopted to 1) protect voter privacy; 2) minimize disruptions of the electoral process; 3) increase efficiency at polling sites; and 4) prevent students under the age of 18 from being photographed in violation of New York City Department of Education Policy.  (Ryan Direct at ¶ 4.)  Since the introduction of paper ballots and scanners at polling sites, the policy also acts to prevent individuals from leaving the polling sites with a photograph of a ballot, creating reproductions of the ballot, and then returning to that polling site to cast counterfeit ballots. (Ryan Direct at ¶ 5.)

The City Board is especially concerned that allowing photography at polling sites will increase the time it takes to vote.  (Ryan Direct at ¶ 6.)  Increasing the time it takes to vote could suppress voter turnout.  (Ryan Direct at ¶ 6.)

Currently, the no photography policy is communicated to voters through the posting of signs depicting the international sign for no photography of a circle around a camera with a line through it (4 per polling site in the 2016 general election) and a single black and white sign advising in English, Spanish, Chinese, Korean, and Bengali that no animals, smoking, eating, drinking, or photography are allowed at the polling site.  (Ryan Direct at ¶¶ 13-15; City Defs.' Ex. 2.)  Poll workers are generally trained every July through the September primary election, with additional refresher training for certain poll workers in October, including instructions relating to the no photography policy.  (Ryan Direct at ¶¶ 16-17.)

        ii.    <u>Professor Graves.</u>

Stephen Graves, Ph. D., the Abraham J. Siegel Professor of Management at the Massachusetts Institute of Technology, testified as an expert regarding a queuing analysis he performed based on a model used to simulate the amount of time voters would spend waiting in

line at polling sites under circumstances where various percentages of voters took photographs of their marked ballots.  Dr. Graves constructed his model using information provided by the City Board, including the number of voting booths (also known as privacy booths) at various sample polling sites in New York City, and a study regarding the amount of time it took voters at Michigan polling sites to complete the voting process.

Dr. Graves' model accounts for three stages of the voting process: check in, vote, and ballot scan.  (Direct Testimony of Stephen Graves, July 28, 2017, Dkt. 122-1 ("Graves Direct") at ¶ 17.)  Queuing theory, applied to the voting process, hypothesizes that: "holding everything else constant, voters will wait in longer lines on Election Day (1) the more voters come to the polls, (2) the longer it takes them to check in, vote, or scan ballots, and (3) the fewer poll books, privacy booths, and scanners there are in a precinct."  (Graves Direct at ¶ 24.)

Dr. Graves based his model upon the ten New York City polling sites that serviced the most voters during the 2016 general election.  (Graves Direct at ¶ 26.)  Simulations run using the model analyzed increased wait times due to photographs taken by voters while they were at the privacy booths, under the assumption that most voters who photograph their ballots will do so at this time.  (Graves Direct at ¶ 29.)  Several variables were needed for the analytical model: "the process and rate at which voters arrive to the polling station; the service time to vote and possibly to take a photograph; and the number of . . . privacy booths in which a voter can mark a ballot."  (Graves Direct at ¶ 30.)

The model simulated the four hours between the polls opening at 6 a.m., through 10 a.m., the busiest period of the day, and used data provided by the City Board from the 2016 general election, including the number of votes cast by hour by borough, the number of votes cast at each sample polling site, and the number of privacy booths and scanners used at each of

those sites.  (Graves Direct at ¶¶ 31-32.)  The model approximated voter arrival times at the polling sites by simulating random arrivals, one at a time.  (Graves Direct at ¶ 34.)  The simulation assumed that the time each voter took to vote, measured as the time between when the voter first occupies the privacy booth and when the next voter could occupy the privacy booth, as three minutes.  (Graves Direct at ¶ 36.)  This estimation was partially based upon measurements made by Professor Charles Steward of voting times in Michigan for the 2016 general election.  (Graves Direct at ¶ 36.)  The model assumes that the time it takes to take a photograph while voting is 18 seconds, based on measurements made by Professor Stewart.  (Graves Direct at ¶ 38.)

     Dr. Graves ran several simulations with his model with different variables for the proportion of voters who took photographs: 20%, 50%, or 100%, and adjusted the time to vote in each simulation by increasing the three minute control by the percentage in each of these three alternatives.  (Graves Direct at ¶ 40.)

          The simulations generated random arrival times for a predetermined estimated total number voters over the time period of the simulation.  (Graves Direct at ¶ 42.)  Once the voter arrives, the voter occupies a vacant booth, or if one is not available, joins a queue and waits until one becomes available.  (Graves Direct at ¶ 42.)  The voter then spends a set amount of time in the privacy booth; three minutes for the control group and three minutes plus additional time for the simulations where voters take photographs, and measures the wait time for each voter, calculated as the time between when the voter arrives and when the voter first occupies a booth.  (Graves Direct at ¶ 42.)

          Each of the simulations were run a number of times and wait times were averaged for each sample polling site and for each alternative percentage of voters taking photographs.

(Graves Direct at ¶ 43.)  The results of the simulations demonstrated that the presence of individuals taking photographs (and thus spending longer times in the privacy booths) caused significantly increased wait times compared with the simulations in which no photographs were taken.  (See Graves Direct at Tables 3-5, pp. 14-15.)  The results of the model based on Frank McCourt High School in Manhattan exemplified the findings of the simulations:

> The average wait increases by three minutes if 20% of voters take photographs, by seven minutes if 50%, and by fifteen minutes if all voters take a photograph. Similarly the maximum wait time goes from 61 minutes to 67 minutes (20% take photographs), to 76 minutes (50%) and to 91 minutes (100%).  Finally, the percent of voters with 30 minute or more waits increases from 49% to 54% (20% taking photographs), to 59% (50% taking photographs) and to 64% (100% taking photographs).

(Graves Direct at ¶ 47.)

The Court accepts that the modelling utilized by Dr. Graves does not take account of all real world considerations present in voting in New York and utilizes some data developed in Michigan which may have its own distinguishing characteristics.  But allowing for those considerations, the Court comfortably finds that permitting ballot photography at the polls would materially increase wait times at New York City polling sites.  The Court further finds that a material increase in wait times would likely suppress voter turnout in certain areas of New York City.

DISCUSSION

I.      First Amendment Standards.

The First Amendment, applicable to the states through the Fourteenth Amendment, states in relevant part that "Congress shall make no law . . . abridging the freedom of speech . . . ."  The protection the First and Fourteenth Amendments afford speech on property owned or controlled by the government depends on the forum in which that speech takes place.

The level of scrutiny with which a court must view a state action restricting speech also depends on the kind of restrictions placed upon that speech.

A.   Traditional Public and Government Designated Fora.

The First Amendment's protection of speech is at its peak when that speech takes place in a traditional public forum, such as a public street or sidewalk.  McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014).  "[T]he government's ability to restrict speech in such locations is 'very limited.'"  Id. (quoting United States v. Grace, 461 U.S. 171, 177 (1983)).  The label of traditional public forum encompasses "places which by long tradition or by government fiat have been devoted to assembly and debate."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).  "In short, traditional public fora are areas that have historically been open to the public for speech activities."  McCullen, 134 S. Ct. at 2529.

A designated public forum, that is, a "government property that has not traditionally been regarded as a public forum," but which has been "intentionally opened up for that purpose," is subject to similarly strict limitations on the government's ability to regulate speech as is a traditional public forum.  Pleasant Grove City v. Summum, 555 U.S. 460, 469-70 (2009).

Government restriction of speech based on the content of that speech in either a traditional public forum or a designated public forum is subject to strict scrutiny.  Perry Educ. Ass'n, 460 U.S. at 45; Pleasant Grove City, 555 U.S. at 469-70.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227 (2015).  Strict scrutiny applies when the government regulation either "defin[es] regulated speech by particular subject matter," or "by its function or purpose," as "[b]oth are distinctions drawn based on the

message a speaker conveys." Id.  Such restrictions "are presumptively unconstitutional and may

be justified only if the government proves that they are narrowly tailored to serve compelling

state interests." Id. at 2226.  The narrow tailoring requirement is met only where "the challenged

regulation is the least restrictive means among available, effective alternatives." Ashcroft v.

ACLU, 542 U.S. 656, 666 (2004).

    In these types of public fora, content-neutral government restrictions "on the time,

place, or manner of protected speech" are permitted.  Ward v. Rock Against Racism, 491 U.S.

781, 791 (1989).  Such restrictions are consistent with the First Amendment if they are "narrowly

tailored to serve a significant governmental interest." McCullen, 134 S. Ct. at 2529.  They "need

not be the least restrictive or least intrusive means of" achieving those interests so long as they

"leave open ample alternative channels for communication of the information." Ward, 491 U.S.

at 791, 798.  In other words, "the requirement of narrow tailoring is satisfied 'so long as the . . .

regulation promotes a substantial government interest that would be achieved less effectively

absent the regulation.'" Id. at 799 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985))

(omission in original).

    B.  Limited Public Fora.

    The government has more latitude to restrict speech in a limited public forum.

"Public property which is not by tradition or designation a forum for public communication is

governed by different standards. . . .  [T]he 'First Amendment does not guarantee access to

property simply because it is owned or controlled by the government.'" Perry Educ. Ass'n, 460

U.S. at 46 (quoting United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S.

114, 129 (1981)).  A limited public forum "exists where the government opens a non-public

forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain

subjects." Hotel Emps. & Rest. Emps. Union, Local 100 v. City of New York Dep't of Parks & Rec., 311 F.3d 534, 545 (2d Cir. 2002) (internal quotation marks omitted).  In such a forum, the "government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre."  Id. at 545-46.  As to speech that the government does permit outside the limited category of speech for which the forum was created, "restrictions need only be viewpoint neutral and reasonable."  Id. at 546.

C.  Non-Public Fora.

"[P]roperty that the government has not opened for expressive activity by members of the public" constitutes a non-public forum.  Hotel Emps. & Rest. Emps. Union, Local 100, 311 F.3d at 546 (non-public fora include airport terminals, military bases, jails, and certain sports complexes).  "The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality."  Id.  Such restrictions must not be "an effort to suppress a speaker because of a disagreement with that person's views."  Longo v. United States Postal Serv., 983 F.2d 9, 12 (2d Cir. 1992).

II.  N.Y. Elec. Law § 17-130(10) Prohibits Ballot Selfies.

N.Y. Elec. Law § 17-130(10) provides that "[a]ny person who . . . [s]hows his ballot after it is prepared for voting, to any person so as to reveal the contents . . . is guilty of a misdemeanor."  The parties agree that the statute would be violated where a voter takes a photograph depicting the voter with his or her marked ballot and then posts the photograph to social media where it can be viewed by others.  This interpretation is supported by the plain language of the statute and the purposes behind its passage.

One dictionary from 1806 defines "show" as "to exhibit to view . . . ."  Noah Webster, Compendious Dictionary of the English Language 276 (1806).  Another early nineteenth-century dictionary defines "show" as "[t]o exhibit to view; to give proof of, to prove; to make known; . . . to tell."  John Walker, Critical Pronouncing Dictionary, and Expositor of the English Language 776 (1st Am. ed. 1803).  A dictionary from the early twentieth century defines "show" as "[t]o exhibit or present to view; to place in sight; to display." Webster's New International Dictionary 1948 (W. T. Harris & F. Sturges Allen, eds. 1930).  Contemporary dictionaries define "show" as "to cause or permit to be seen . . . ."  Webster's Third New International Dictionary of the English Language Unabridged 2105 (1961).  A reasonable person would understand that posting a photograph of one's ballot on social media would be to present, exhibit, or display the ballot in a manner so that it may be viewed or seen by another person.

The purpose of the statute was to keep the perpetrators of election fraud from verifying their targets' votes.  Thus, the prohibition only applies to the display of a ballot "after it is prepared for voting."  N.Y. Elec. Law § 17-130(10).  In practical terms, this means after the ballot has been marked with the voter's choices and is ready to be cast or deposited in the manner designated by election officials.  And the "show[ing]" of such a ballot is only prohibited when it is shown "to any person so as to reveal the contents."  N.Y. Elec. Law § 17-130(10).  For example, showing the back of a marked ballot, or the front of a ballot with the markings obscured, is not prohibited by the statute.

Markings may be displayed by a photograph of the ballot as well as by the ballot itself.  Photography existed decades before the law was enacted.  More primitive methods of "show[ing]" a voter's marked ballot also existed, including through the use of mirrors or other

reflective surfaces.  The legislature that enacted the statute would have known this and would have intended to prohibit the indirect showing of a marked ballot by photography or by mirror.

The Court concludes that the plain meaning of the language of the statute at the time it was enacted, the underlying purpose of the statute, and the likely intent of the legislature that enacted it all support the interpretation that the behavior in which plaintiffs wish to engage is prohibited.

III.    N.Y. Elec. Law § 17-130(10) Survives Strict Scrutiny.

The First Amendment's protection is at its apex with respect to political speech, and "'has its fullest and most urgent application' to speech uttered during a campaign for political office." Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011) (quoting Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 223 (1989)).  However,

> [T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society.  Indeed, no right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

Burson v. Freeman, 504 U.S. 191, 209 (1992) (plurality opinion) (internal citation and quotation marks omitted).

N.Y. Elec. Law § 17-130(10) is narrowly tailored to further a compelling state interest and thus survives strict scrutiny.

A.  N.Y. Elec. Law § 17-130(10) Furthers a Compelling State Interest.

i.    Burson.

"[A] State 'indisputably has a compelling interest in preserving the integrity of its election process.' . . .  In other words, . . . a State has a compelling interest in ensuring that an

individual's right to vote is not undermined by fraud in the election process." <u>Burson</u>, 504 U.S. at 199 (quoting <u>Eu</u>, 489 U.S. at 231).  A state has a further compelling interest in "protecting voters from confusion and undue influence."  <u>Id.</u>  As a result, the Supreme Court has upheld against First Amendment challenges "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself."  <u>Id.</u>

In <u>Burson</u>, the Supreme Court upheld against a First Amendment challenge a Tennessee law that prohibited certain campaign related speech, including the display of campaign materials, such as signs or posters, or the solicitation of votes for or against a person, political party, or position on a question, within 100 feet of the entrance to a polling site.  <u>Id.</u> at 193-95.  This statute, first enacted in slightly different form in 1890, was intended to combat the same evils that the 1890 New York statute was intended to combat; vote buying and voter intimidation.  <u>Id.</u> at 200-05.

A campaign-free zone around the polling site reinforces secrecy in the voting booth while also addressing concerns regarding vote buying and voter intimidation in additional ways; it does away with a potential marketplace for the sale of votes within the immediate vicinity of the polling site and makes it more difficult for individuals to intimidate voters who are approaching the polling site or waiting in line.  <u>See</u> <u>id.</u> at 202 (The Supreme Court described approaching a polling site before passage of the law as "akin to entering an open auction place. . . . Sham battles were frequently engaged in to keep away elderly and timid voters of the opposition.").  However, the Supreme Court in <u>Burson</u> emphasized that the Tennessee law in question was only one piece of the Australian ballot reforms in that state, which also included secret, standardized ballots.  <u>Id.</u> at 206.  The Court noted that these provisions worked in tandem to combat voter fraud.  <u>Id.</u>

Though the Supreme Court in <u>Burson</u> did not directly face a challenge to the part of the Tennessee Australian ballot reforms that mandated secret ballots, the Supreme Court's analysis made clear the necessity of the secret ballot to the reforms as a whole, which were necessary to remedy the evils of vote buying and voter coercion, which undermine the integrity of elections and which the state has a compelling interest to protect:

> In sum, an examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud.  After an unsuccessful experiment with an unofficial ballot system, all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments.  We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud.

<u>Id.</u> at 206; <u>see</u> <u>also</u> <u>id.</u> at 207-08 ("[T]he link between ballot secrecy and some restricted zone surrounding the voting area is not merely timing – it is common sense.  The only way to preserve the secrecy of the ballot is to limit access to the area around the voter.").  The Supreme Court specifically noted the arguments put forth at the time of the Australian ballot reforms in favor of secret ballots, acknowledging how secret ballots would combat vote buying and voter intimidation: "Another argument strongly urged in favor of the reform was that it would protect the weak and dependent against intimidation and coercion by employers and creditors.  The inability to determine the effectiveness of bribery and intimidation accordingly would create order and decency at the polls." <u>Id.</u> at 203.  There can be no doubt that the state's interest in preventing vote buying and voter intimidation through ensuring the secrecy of the ballot is a compelling one.

ii.   N.Y. Elec. Law § 17-130(10) was Designed to Combat Election Fraud.

The same concerns regarding vote buying and voter intimidation that prompted the adoption of the Australian ballot reforms nationwide, as well as the enactment in 1890 of the specific Tennessee statute at issue in Burson, motivated the enactment of N.Y. Elec. Law § 17-130(10) that same year.  The evidence at trial supports the conclusion that in New York, prior to the enactment of the statute, vote buying and voter intimidation were rampant.  (Kellner Direct at ¶ 10.)  Preventing these evils and upholding the integrity of New York's elections is a compelling state interest.

After New York's adoption of the Australian ballot reforms vote buying and voter intimidation virtually disappeared.  (Adler Direct at ¶ 15; Kellner Direct at ¶ 15.)  Yet they did not disappear completely—a handful of vote buying schemes have been uncovered in the last several years.  (Kellner Direct at ¶ 16.)  A federal prosecution in this district against the perpetrators of a vote buying scheme is still ongoing.  (Kellner Direct at ¶ 16; State Defs.' Exs. 6-7.)

The lack of evidence of widespread vote buying and voter intimidation in contemporary New York elections does not mean that the state no longer has a compelling interest in preventing these evils.  See Burson, 504 U.S. at 208 ("the long, uninterrupted, and prevalent use of these statutes makes it difficult for States to come forward with the sort of proof the dissent wishes to require").  As the Supreme Court has observed, "it is difficult to isolate the exact effect of these laws on voter intimidation and election fraud.  Voter intimidation and election fraud are successful precisely because they are difficult to detect."  Id.

N.Y. Elec. Law § 17-130(10) was adopted in substantially the same form 127 years ago and has been in effect ever since.  Defendants are thus limited in their ability to present

evidence of what would happen if the statute were stricken or its application limited to a person-to-person showing of a marked ballot. Defendants have convincingly demonstrated that secret ballots remain critical to combating vote buying and voter intimidation.

Plaintiffs urge this Court to follow Rideout v. Gardner, where the First Circuit, in upholding the district court's injunction against the enforcement of a New Hampshire statute updated in 2014 to specifically prohibit the sharing via social media of a digital photograph of a marked ballot, found that the statute did not address an "actual problem in need of solving." 838 F.3d 65, 68, 72 (1st Cir. 2016) (internal quotation marks omitted). In that case, decided on summary judgment, virtually no specific evidence was presented regarding vote buying or voter intimidation in New Hampshire. Id. at 73. In the present case, ample evidence has been presented regarding vote buying and voter intimidation in New York, both historic and contemporary. And New Hampshire is not New York City. New York elections were bought and sold for decades before the introduction of the Australian ballot reforms. The statute was an appropriate response to the political corruption in New York in 1890 and is a valid measure today to prevent that history from repeating itself.

B.  N.Y. Elec. Law § 17-130(10) is Narrowly Tailored.

For the statute as applied to ballot selfies to survive strict scrutiny the state must demonstrate not only that the law serves a compelling state interest, but also that the law is narrowly tailored to serve that interest. Reed, 135 S. Ct. at 2226. To make this showing, the state must "prove that the proposed alternatives will not be as effective as the challenged statute." Ashcroft, 542 U.S. at 665. Because speech must not be restricted further than necessary to achieve the state's interest, the statute must be "the least restrictive alternative that can be used to achieve that goal." Id. at 666. In other words, the statute will be struck down if

the government does not prove that "the challenged regulation is the least restrictive means among available, effective alternatives."  Id.

Vote buying and voter intimidation are against the law.  However, these crimes, in and of themselves, are very difficult to detect.  (Kellner Direct at ¶ 13; Adler Direct at ¶¶ 5-6.)  A key way to disrupt this kind of voter fraud is to prevent would-be vote buyers and intimidators from verifying their targets' compliance.  (Adler Direct at ¶ 6.)  Viewing a photograph of an individual along with their marked ballot is an especially efficacious way to verify that the individual in the photograph voted consistent with the marked ballot in the photo, as such a photograph would be more difficult to fake.

Plaintiffs argue that the statute is overinclusive because it criminalizes the posting of photographs of marked ballots to social media by individuals who are not involved in a vote buying scheme or any other kind of voter fraud.  (Pls.' Trial Brief, July 7, 2017, Dkt. 110 at 9.)  Plaintiffs allege that the least restrictive means of upholding the state's compelling interest in the integrity of elections is to criminalize vote buying and voter intimidation.  (Id.)  The Supreme Court rejected a similar argument with respect to the 100-foot restricted zone around polling sites in Burson, finding that "[i]ntimidation and interference laws fall short of serving a State's compelling interests because they deal with only the most blatant and specific attempts to impede elections."  Burson, 504 U.S. at 206-07 (internal quotation marks omitted).  Likewise, history and common sense teach that prohibiting vote buying and voter intimidation are unlikely to be a particularly effective means to combat these evils so long as the perpetrators may verify their target's votes.  It was in fact the failure of such laws that prompted the Australian ballot reforms in the first place.  (Kellner Direct at ¶¶ 10, 12.)

Next, plaintiffs argue that the statute does not effectively prevent vote buyers or intimidators from verifying their targets' votes because photographs of marked ballots could be transmitted privately rather than posted publically, and these transmissions would be virtually impossible to detect.  (Pls.' Trial Brief, July 7, 2017, Dkt. 110 at 9.)  Thus, plaintiffs argue, the prohibition on the display of a photograph of a marked ballot does not in any way prevent vote buying or voter intimidation beyond the criminal statutes prohibiting such behavior directly.

While at first glance it appears intuitive that an individual engaged in a vote buying scheme would not publically post a ballot selfie on social media for fear of detection, closer examination reveals that in reality, the opposite is true.  A vote buyer or voter intimidator who wishes to verify his targets' votes is presented with a dilemma—the electronic transmittal of a photograph of a marked ballot will almost invariably leave some sort of electronic record.[4]  In order to eliminate an electronic trail, the perpetrator might command that the photograph be posted to social media, where anyone can see it.  Using this tactic, the perpetrators of election fraud would leave virtually no evidence of their misdeeds and authorities would have little hope of apprehending them, especially in the likely event that posting ballot selfies increases in popularity absent this law.

Plaintiffs further argue that a photograph of a marked ballot is not an efficacious way for a vote buyer or voter intimidator to verify his or her targets' vote because the voter could take a photograph of a marked ballot at a polling place but then either change the markings on the ballot before submitting it or submit a different ballot entirely.  (Pls.' Post-Trial Brief,

_____

[4] Apps, like Snapchat, which are designed to transmit photographs that are available to the receiver for only a period seconds before being permanently deleted and leave a very limited record, if any, regarding images sent or received, normally inform the sender or receiver of the image if the other party takes a screenshot.  Taking a screenshot and sharing Snapchat snaps without consent is illegal in the UK, N.Y. Daily News (May 29, 2016), available at http://www.nydailynews.com/news/world/illegal-screenshot-share-snapchat-snaps-uk-article-1.2581553.  However, this functionality can be easily defeated by either taking a photograph of the screen with a different camera, or taking a screenshot and quickly activating the phone's airplane mode.  Id.

September 11, 2017, Dkt. 138 at 3.)  However, evidence at trial indicated that while a voter could photograph a marked ballot and then not submit that ballot, they would be unable to change the markings on the ballot or submit a different ballot without the vote buyer or intimidator finding out.  Erasing the markings on the ballot would likely invalidate the ballot.  (Tr. 49-50.)  A voter may, however, obtain a new ballot if the original ballot is spoiled.  (Tr. 49.)  But the fact that a voter received a new ballot in this way would be noted in publically available records.  (Tr. 51-52.)  By checking these records to confirm that the target had not received a new ballot in this way, a vote buyer or intimidator could be sure that the target either cast a vote consistent with the ballot markings displayed in the ballot selfie or did not submit a ballot at all.

Plaintiffs put forth no alternative that would be as effective in restricting the ability of individuals or entities who would commit election fraud from ensuring that their targets complied with their instructions, and the Court is aware of none.  As described, any law prohibiting only the posting to social media of photographs of marked ballots for fraudulent purposes would allow the posting of marked ballots in general to proliferate, thus giving cover to those who would use these photographs to fraudulently alter elections.

C.  Social Coercion.

N.Y. Elec. Law § 17-130(10) is narrowly tailored to serve the compelling government interest of preventing vote buying and voter intimidation, and thus survives strict scrutiny.  Separately, though not unrelatedly, the law is narrowly tailored to serve the compelling government interest in maintaining the integrity of the election process by preventing employers and other groups and organizations from exercising more subtle forms coercion on their members to enforce orthodoxy in voting.

Defendants argue that the potential for coercion by employers, unions, and other groups represents a serious threat to the integrity of elections in New York.  (State Defs.' Trial Brief, July 28, 2017, Dkt. 126 at 19.)  Such coercion, they argue, is difficult to address through laws that prohibit threating to inflict harm or loss on a voter to influence voting behavior.  (Id. at 19-20.)

Employers and other organizations have many ways of enforcing various kinds of orthodoxy among their employees and members.  Currently, an employer or group's power to enforce political orthodoxy among its members ends at the entrance to the voting booth.  Without the prohibition on displaying a photograph of one's marked ballot, the protection gained from secret voting will disappear, and employers, unions, political groups, or religious organizations will be able to pressure individual members to produce photographs of ballots marked in support of the organization's preferences, or face suspicion that the person has acted in an unorthodox manner.  (See Adler Direct at ¶¶ 36, 39.)

This social pressure that could be brought to bear could be both direct and indirect, subtle and open.  Members could be pressured to produce such photographs in private, to management, or leaders of the organization, or to post them publically on a group social media page.  For many voters, ballot secrecy must be required by law for voting in secret to even be an option.

Easy cases, such as an employer firing an employee for failure to post may be reached by a narrower law.  But private associations and groups would be much harder to police. More subtle sanctions, such as the disapprobation of other individuals in the organization, or the possibility of being shunned by group members, or even entire communities, would be difficult to address.  The state has a compelling interest in ensuring that citizens are allowed to vote their

conscience.  Secrecy in voting allows the voter to engage in the act of voting free from the judgement of others.

IV.   N.Y. Elec. Law § 17-130(10) is a Permissible Content-Based Restriction of Speech in a Non-Public Forum.

In the alternative, the Court finds that the New York statute is a permissible content-based restriction of speech in a non-public forum.

A.   N.Y. Elec. Law § 17-130(10) is a Content-Based Restriction.

The Court finds that the challenged statute regulates speech based on its content, as it "applies to particular speech because of the topic discussed or the idea or message expressed."  Reed, 135 S. Ct. at 2227.  Even after Reed clarified that speech restrictions are content based even when they are neutral with regards to ideas or viewpoints, so long as they discriminate based on subject matter, there remains disagreement over the scope of the ruling. See Reed, 135 S. Ct. at 2233 (Alito, J., concurring) ("Rules imposing time restrictions on signs advertising a one-time event . . . do not discriminate based on topic or subject and are akin to rules restricting the times within which oral speech or music is allowed."); Reed, 135 S. Ct. at 2237 n.* (Kagan, J., concurring) (arguing that restrictions on signs advertising one-time events would be considered content-based under the majority's reasoning); Act Now To Stop War & End Racism Coal. v. District of Columbia, 846 F.3d 391, 403 (D.C. Cir. 2017) (finding speech restriction distinguishing between event-related signs and signs not related to an event content neutral).

Because the statute prohibits showing another person one's marked ballot, regardless of the contents, it is viewpoint neutral.  It is neutral with respect to subject matter, at least in a narrow sense, because the law does not distinguish between ballots marked with respect to candidates or with respect to ballot initiatives or referenda.  It distinguishes between ballots

that are marked and those that are not.  The law's effect is essentially to prohibit individuals from

using the medium of a marked ballot for expressive conduct.  The law does not prohibit showing

another an unmarked ballot, regardless of what additional communicative content is included; it

does not, for example, prohibit sharing a photograph of an unmarked ballot with a message

written on it.

Though cognizant of the ambiguity that remains in the wake of Reed regarding

how broadly or narrowly courts must interpret the subject matters between which a government

speech restriction distinguishes, the Court concludes that the statute restricts speech on the basis

of its content.

B.  Strict Scrutiny does not apply to all Content-Based Speech Restrictions.

Plaintiffs argue that Reed overturned Supreme Court precedent regarding forum

analysis and thus all content-based restrictions of speech must be subjected to strict scrutiny.

(Pls.' Trial Brief, July 7, 2017, Dkt. 110 at 2.)  While the Supreme Court did state in Reed that

"[c]ontent-based laws . . . may be justified only if the government proves that they are narrowly

tailored to serve compelling state interests," 135 S. Ct. at 2226, reading this language in the

context of the case, and in view of more recent circuit court decisions, this Court concludes that

the forum analysis traditionally required in evaluating First Amendment challenges remains

intact.

First, Reed dealt with a municipal code that restricted the display of outdoor signs

"anywhere within the town," including on private property.  Id. at 2224.  Thus traditional forum

analysis, which relates to property owned or controlled by the government, was inapplicable.

Second, in Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct.

2239, 2250 (2015), decided the same day as Reed, the Supreme Court discussed forum analysis

in dicta, but ultimately found such analysis inapplicable after holding that the speech in question was government speech.  In <u>Johnson v. Perry</u>, 859 F.3d 156, 171 (2d Cir. 2017), the Second Circuit applied forum analysis in the context of evaluating a First Amendment free assembly claim.  Other circuit courts since <u>Reed</u> have applied less than strict scrutiny to content-based restrictions of speech in limited public or non-public fora.  <u>See</u> <u>Heaney v. Roberts</u>, 846 F.3d 795, 801-02 (5th Cir. 2017); <u>Ball v. City of Lincoln</u>, No. 16-3210, 2017 U.S. App. LEXIS 16472, at *25-26 (8th Cir. Aug. 29, 2017); <u>Reza v. Pearce</u>, No. 13-15154, 2015 U.S. App. LEXIS 20120, at *13-14 (9th Cir. Nov. 19, 2015); <u>Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.</u>, 660 F. App'x 600, 605-06 (10th Cir. 2016).

> C.  <u>Polling Sites are Non-Public Fora.</u>

To determine the type of forum in which speech takes place, courts "examine the forum's physical characteristics and the context of the property's use, including its location and purpose."  <u>Hotel Emps. & Rest. Emps. Union, Local 100</u>, 311 F.3d at 547.  "The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used.  Also relevant is the government's intent in constructing the space and its need for controlling expressive activity on the property, as evidenced by its policies or regulations."  <u>Id.</u> (internal citation and quotation marks omitted).  A court also considers "whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity."  <u>Id.</u> (internal quotation marks omitted).

Polling sites in New York are located on both public and private property, including schools, buildings owned by religious organizations, and other privately owned buildings that are exempt from taxation or whose owner has received certain tax exemptions, subsidies, or loans from a municipality or state agency.  N.Y. Election L. § 4-104.  Expressive

activities have been restricted at polling sites in New York since the adoption of the Australian ballot reforms in 1890.  See N.Y. L. 1890, Ch. 262 § 35 ("No person shall do any electioneering on election day within any polling place, or in any public street or room, or in any public manner, within one hundred and fifty feet of any polling place."); compare with N.Y. Elec. Law § 17-130(4) ("Any person who . . . [e]lectioneers on election day or on days of registration within one hundred feet . . . from a polling place . . . is guilty of a misdemeanor."); see also N.Y. Elec. Law § 17-130(9) ("Any person who . . . [h]aving lawfully entered a voting booth with a voter, requests, persuades or induces such voter to vote any particular ballot or for any particular candidate . . . is guilty of a misdemeanor.").

Polling sites in New York are used only temporarily, and only for the specific purpose of allowing voters to cast ballots.  (See Ryan Direct at ¶¶ 13-15; City Defs.' Ex. 2 (no eating, drinking, pets, smoking, or photography are allowed at polling sites).)  Poll workers are required to keep polling sites peaceful and quiet.  (Pls.' Ex. F, City Board's Basic Poll Worker Manual for 2017/2018 at 4.)  Poll workers are instructed not to discuss "[c]andidates or issues on the ballot; topics related to the ethnicity, culture, religion and gender of a Poll Worker, voter, or any other person at the Poll Site."  (Id.)

Because polling sites are opened by the government only for the specific purpose of enabling voters to cast ballots and are not historically open for public debate or speech generally, and the necessary limits on speech within polling sites to ensure orderly and efficient elections, the Court concludes that they are non-public fora.  Other courts that have addressed this question agree with this assessment.  See Marlin v. D.C. Bd. of Elections & Ethics, 236 F.3d 716, 719 (D.C. Cir. 2001) ("[T]he interior of a polling place[] is neither a traditional public forum nor a government-designated one. . . .  The only expressive activity involved is each

voter's communication of his own elective choice and this has long been carried out privately—by secret ballot in a restricted space."); PG Publ'g Co. v. Aichele, 705 F.3d 91, 100 n.10 (3d Cir. 2013) ("We take this opportunity to make explicit that which has been implicit in our preceding discussion: A polling place is a nonpublic forum."); United Food & Commercial Workers Local 1099 v. City of Sidney, 364 F.3d 738, 749 (6th Cir. 2004) ("By opening up portions of school and private property for use as polling places on election day, Ohio has not opened up a nontraditional forum for public discourse."); Cotz v. Mastroeni, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("Polling places clearly are non-public fora and voters present are subject to various First Amendment restrictions, including those based on content."). Though the Supreme Court found in Burson that the 100-foot perimeter of a polling site was a public forum, that Court did not reach the question of whether the interior of the polling site was itself a public forum. See Burson, 504 U.S. at 196-97; but see id. at 216 (Scalia, J., concurring) ( "the environs of a polling place, on election day, are simply not a 'traditional public forum.'").

It is true that voters could take a photograph of themselves with their marked ballots at the polling site and then upload that photograph to social media once outside the polling site, say, in Times Square, a quintessential traditional public forum, or in the privacy of their own home. But the posting of a photograph of a marked ballot to social media requires two steps: the taking of the photograph and the electronic transmission of that photograph. Because the first step must take place in a non-public forum and the second step may take place in a non-public forum, it is appropriate to assess the impact of the statute as a restriction of speech taking place in a non-public forum.

Certain federal statutes, like this state statute, restrict types of speech that often, or always, must occur partially in a non-public forum and partially outside of one. For example, 18

- 33 -

U.S.C. § 797 subjects to imprisonment and fine anyone who, under certain circumstances, "reproduces, publishes, sells, or gives away any photograph, sketch, picture, drawing, map, or graphical representation of [] vital military or naval installations or equipment." A plain reading of this statute indicates that someone who took photographs of equipment on a military base, a non-public forum, and then displayed them or uploaded them to social media off of the military base, would be in violation of the statute. The Court is aware of no precedent suggesting that this statute is subject to lesser scrutiny where such a display or disclosure occurs in a public forum. The same goes for the law prohibiting the disclosure of classified information (18 U.S.C. § 798) and the law prohibiting the disclosure of the contents of a wiretap (18 U.S.C. § 2511(1)(c)).

### D.  Ballots are not Themselves Public Fora.

The Supreme Court has held that ballots themselves are not public fora:

> We are unpersuaded, however, by the Party's contention that it has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate. Ballots serve primarily to elect candidates, not as fora for political expression.

Timmons v. Twin Cities Area New Party, 520 U.S. 351, 362-63 (1997); Burdick v. Takushi, 504 U.S. 428, 438 (1992) (finding that state's "ban on all forms of write-in ballots" was permissible, as Supreme Court had "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls"); Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 461 (2008) (Roberts, C.J., concurring) ("the State controls the content of the ballot, which we have never considered a public forum")

The State of New York has historically regulated how voters may mark a ballot and controlled possession of the ballot itself. See N.Y. L. 1890, Ch. 262 § 35 ("No person shall

remove any official ballot from any polling place before the closing of the polls. . .  No voter

shall receive an official ballot from any other person than one of the ballot clerks having charge

of the ballots, nor shall any person other than such ballot clerks deliver an official ballot to such

voter.  No voter shall place any mark upon his ballot by means of which it can be identified as

the one voted by him.")  For ballots not marked at polling sites, the State of New York heavily

regulates the process by which they are sent to the voter, marked, and returned.  See N.Y. Elec.

Law § 7-122 (regulations regarding absentee ballots generally); N.Y. Elec. Law § 7-124

(regulations regarding special federal ballots generally); N.Y. Elec. Law § 17-130(20) ("Any

person who . . . [i]ntentionally opens an absentee voter's envelope or examines the contents

thereof after the receipt of the envelope by the board of elections and before the close of the polls

at the election . . . is guilty of a misdemeanor."); N.Y. Elec. Law § 17-132(6) ("Any person who .

. . [b]eing an applicant for an absentee voter's ballot, makes a material false statement in his

application, or a person who makes a material false statement in a medical certificate or an

affidavit filed in connection with an application for an absentee voter's ballot . . . is guilty of a

felony."); N.Y. Elec. Law § 17-132(7) ("Any person who . . . [n]ot being a qualified absentee

voter, and having knowledge or being chargeable with knowledge of that fact, votes or attempts

to vote as an absentee voter . . . is guilty of a felony."); N.Y. Elec. Law § 17-132(8) ("Any

person who . . . [f]raudulently signs the name of another upon an absentee voter's envelope or

aids in doing or attempting to do a fraudulent act in connection with an absentee vote cast or

attempted to be cast . . . is guilty of a felony.")

   Ballots in the state of New York are not public fora.  They are used by the state

for the sole purpose of allowing the voter to record their vote in a form in which it can be

tabulated by the appropriate election officials.

E.  <u>N.Y. Elec. Law § 17-130(10) is Reasonable and Viewpoint Neutral.</u>

The statute is viewpoint neutral.  It prohibits showing another person a marked ballot regardless of the contents of that ballot.  The restriction is a reasonable measure to combat vote buying and voter coercion.  It is thus an acceptable state restriction of speech taking place in a non-public forum and does not contravene the First or Fourteenth Amendments.  Even if polling sites or ballots were considered limited public fora, the result would be the same, as posting photographs of marked ballots to social media is "outside the limited category of speech for which the forum has been opened," whatever that category of speech may be.  <u>Hotel Emps. & Rest. Emps. Union, Local 100</u>, 311 F.3d at 546.

Plaintiffs argue that ballot selfies are "uniquely compelling" political messages, partly because messages conveyed with both words and images are more powerful than messages conveyed with words alone, and partly because a ballot selfie has "unique credibility," and that the expressive value of this manner of speech weighs in favor of striking down the law. (Brezler Direct at ¶¶ 9, 13, 16.)  There is no doubt that a ballot selfie is a potent form of speech in that it sends a strong message that the individual in the photograph submitted the marked ballot depicted in the photograph.  They are incontrovertibly unique.  But other forms of visual display of candidate support may be as compelling or nearly as compelling without the attendant dangers outlined herein.

V.     <u>The City Board's No Photography Policy.</u>

A.  <u>The City Board has Authority under State Law to Prohibit Photography at Polling Sites.</u>

Plaintiffs first argue that the City Board lacked the authority under state law to enact the no photography policy.  (Pls.' Trial Brief, July 7, 2017, Dkt. 110 at 12.)  State law provides for the creation of the City Board.  N.Y. Elec. Law § 3-200(1).  The City Board has the

authority to appoint election inspectors and poll clerks, and election inspectors are required to follow the direction of the City Board.  N.Y. Elec. Law §§ 3-402, 3-404.  Further, election inspectors are required to "preserve good order within and around the polling place."  N.Y. Elec. Law § 3-402.  The no photography policy is a reasonable regulation that is closely related to ensuring order at polling sites.  The City Board did not exceed the scope of its statutory authority by enacting this policy.

Plaintiffs further argue that the policy is improper because it has not been reduced to writing and no record of its enactment was produced at trial.  However, the Court finds based upon the testimony and exhibits at trial that the City Board has established a policy prohibiting photography except by accredited members of the press that has been in existence for over 20 years.  Poll workers receive training regarding the signs informing voters of the policy.  Plaintiffs do not make any arguments regarding insufficient notice of the policy, and Director Ryan testified that multiple no photography signs are put up at every polling site.  If plaintiffs wish to challenge the sufficiency of the administrative procedures whereby this policy was enacted, this is not the proper action to present the challenge.

B.  The No Photography Policy is Content-Neutral.

Photographs are protected by the First Amendment.  Bery v. City of New York, 97 F.3d 689, 696 (2d Cir. 1996).  The act of taking a photograph, though not necessarily a communicative action in and of itself, is a necessary prerequisite to the existence of a photograph.  It follows that the taking of photographs is also protected by the First Amendment. See Fields v. City of Phila., 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings, and for this protection to have meaning the Amendment must also protect the act of creating that material.") (internal citation omitted); ACLU v.

Alvarez, 679 F.3d 583, 595 (7th Cir. 2012) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording.") (emphasis in original).

Photography is not permitted in polling sites in New York City. This is the case regardless of what is being photographed. This policy prevents equally a photograph of a ballot, a photograph of another voter, or a photograph of the wall. It is thus content-neutral. The policy regulates the medium, rather than the content, of expression.

The City Board's no photography policy does not contravene the First Amendment. Polling sites are non-public fora and the policy is a reasonable, viewpoint-neutral restriction to maintain order at polling sites and decrease wait times. Cf. Westmoreland v. CBS, 752 F.2d 16, 23-24 (2d Cir. 1984) (no First Amendment right to have television cameras in courtroom). However, even if polling sites were traditional public fora, the statute would still pass muster because it is a content-neutral time, place, or manner restriction that is "narrowly tailored to serve a significant governmental interest," and that "leave[s] open ample alternative channels for communication of the information." McCullen, 134 S. Ct. at 2529.

Based upon the evidence presented at trial, the Court finds that the policy was adopted to 1) protect voter privacy; 2) minimize disruptions of the electoral process; 3) increase efficiency at polling sites; 4) prevent students under the age of 18 from being photographed in violation of New York City Department of Education Policy; and 5) hinder the production of counterfeit ballots. (Ryan Direct at ¶¶ 4-5.) Dr. Graves' simulations, while not foolproof predictors of the actual effects of permitting photography at polling sites, reinforced the common-sense understanding that allowing voters to take ballot selfies would increase the time it takes them to complete the voting process and therefore increase the length of lines and voters'

wait times at those sites.  Long waiting times tend to suppress voter turnout.  (Adler Direct ¶ 58.)[5]

Common sense teaches that for many voter-photographers, taking a ballot selfie will take much longer than the 18 seconds assumed by Dr. Graves.  Some voters will require multiple photographs to capture their ballot along with themselves in different poses, or repeated photographs where the original was inadequate due to deficient lighting, disheveled hair, or misplaced accessories.  Some voters, unaccustomed to using the camera on their phones, will struggle to activate, and then use, the camera functionality.  Others will have to orchestrate a different photograph for each of their various apps.

The no photography policy is narrowly tailored because nothing short of a complete ban on photography by voters at polling sites would address these concerns.  Prohibiting only photography that takes an unreasonably long time would not be efficacious because many individuals taking even a marginally increased time to vote can combine to cause substantially increased wait times.  (See Graves Direct at Tables 3-5, pp. 14-15.)  It would be unreasonable to expect poll workers, already responsible for numerous tasks on Election Day, to monitor the length of time it takes voters to take photographs.  It would be virtually impossible to prevent inadvertent photographs of minors or other individual's ballots with anything short of a full photography ban.

The no photography policy leaves open ample alternative means by which voters can signal their support for a candidate.  Voters can still post to social media (using messages that contain both words and images), attend rallies, donate to campaigns, volunteer, or express

---

[5] The Court's finding that permitting ballot selfies would materially increase wait time at the polls, and that this would suppress voter turnout, applies with equal force to the Court's conclusion that N.Y. Elec. Law § 17-130(10) is a reasonable restriction on speech in a non-public forum.  In addition to preventing election fraud, the statute is a reasonable measure to decrease wait times at polling sites, as well as to maintain order and efficiency therein.

their views in a multitude of ways without taking photographs at polling sites.  The exception for members of the press who obtain credentials ensures that the public record does not become completely devoid of photographs of the interior of polling sites.

The City Board's no photography policy is thus consistent with the First Amendment regardless of what type of forum polling sites are considered.

VI.    State Law Claims.

Plaintiffs also bring a claim under the New York State Constitution.  Pursuant to 28 U.S.C. § 1367, federal courts may exercise supplemental jurisdiction "to hear state law claims that are so related to federal question claims brought in the same action as to 'form part of the same case or controversy under Article III of the United States Constitution.'"  Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004) (quoting 28 U.S.C. § 1367(a)). However, a district court "may decline to exercise supplemental jurisdiction over a [state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  Having dismissed plaintiffs' First and Fourteenth Amendment claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims.

CONCLUSION

Because plaintiffs have failed to show that N.Y. Elec. Law § 17-130(10) or the City Board's no photography policy abridge their rights under the First and Fourteenth Amendments, their claims are dismissed.  The Clerk is directed to enter judgment for the defendants and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        September 28, 2017